SALVOR WRECKING, ETC., CO. (LEATHERS v.). See Case No. 8,164.

---

## Case No. 12,273.

SALVOR WRECKING CO. v. SECTIONAL DOCK CO.

[3 Cent. Law J. 640;[1] 12 Pac. Law Rep. 74.]

Circuit Court, E. D. Missouri. Sept. Term, 1876.

SALVAGE — ADMIRALTY JURISDICTION — MARITIME CONTRACTS AND SERVICES.

Services rendered in raising the sectional floating docks of the respondent are not the

[1] [Reprinted from 3 Cent. Law J. 640, by permission.]

subject of salvage compensation, nor are they maritime, so as to give the admiralty jurisdiction of a suit to recover the value of such services.

[Cited in Cope v. Vallette Dry-Dock Co., 10 Fed. 145, 16 Fed. 925; s. c. on appeal, 119 U. S. 630, 7 Sup. Ct. 338.]

This is a libel suit in personam for salvage, or for services claimed to be in the nature of salvage services, by the Salvor Wrecking and Transportation Company, against a corporation called the Sectional Dock Company, and against the individual members of that company. The services for which compensation is claimed consisted in work and labor by the libellant's boats and servants, in raising a structure known as "Sectional Docks." These docks were constructed about twelve or thirteen years ago. They consist of sections or compartments joined together, each section being a huge water-tight crib or box, so constructed as that they may be sunk, by the admission of water therein, so deep. in the river that a boat or vessel needing repairs may stand over them, and on the water being pumped out by means of an engine and pumps (which constitute part of the apparatus), the docks will rise to the surface of the river or a little above it, bearing the boat or vessel to be repaired with them, and sustaining it while the repairs are being made. When the repairs are completed the structure is submerged in the same way, and the vessel thus enabled to leave the docks, which, on being pumped out, rise to the surface of the river. They are intended solely for the repair of vessels, and to prevent the necessity of hauling them upon ways or dry-docks for repairs. They have no motive power of their own, and are not intended for navigation or to be moved about, except to secure a more convenient locality. They are fastened to the shore securely by large iron cables or chains, and have been in this position in the Mississippi river at St. Louis for many years. These docks were originally owned by a partnership known as the Sectional Dock Company, of which some of the individual respondents were members. One of the co-partners died, and under the peculiar provisions of the Missouri statute, administration was granted by the probate court of St. Louis county to one Daniel G. Taylor on the partnership property, and the docks passed into the possession of that administrator. While in his possession a portion of the docks, without breaking away from the shore or parting the cables, sunk so deep that they could not be raised by their own pumps, and extraneous aid was needed. The administrator called on the libellants to render such aid. No fixed compensation was agreed upon between the administrator and the libellants, for the reason, as stated by the former, that if when the work was done the libellants should charge too much, the probate court would not allow it. Libellants commenced work about September 27, 1873. On October 29, the work of raising the docks being still in progress, the docks were sold by order of the probate court on the express condition that the purchaser should take the docks in their then condition, and be at any future expense for raising them. The respondent, Thomas, purchased the docks for himself and the other individual respondents, with the exception of Adkins. Shortly afterwards he demanded possession of the docks of the libellants, which he did not obtain, and they continued their work thereon (whether with or against the consent of Thomas is a disputed question) until the 22d day of November, when the docks were raised and delivered to the dock company, the libellants reserving, in a letter accompanying the delivery, their lien thereon for their work and labor. The libellants have been paid about $5,000 by the order of the probate court, which is in full for all services up to the day of the sale by the administrator on the 29th day of October. The respondent dock company is a corporation which was formed about November 10, 1873, and which organized November 20th, being about the time when the libellants completed their work. This suit is to recover for the services rendered after the sale on October 29, and the libel and monition show that it was intended to recover for salvage services, or services in the nature of salvage services. The district court dismissed the libel as to the individual respondents, and adopting the report of the commissioner as to the amount of the compensation, rendered a decree against the corporation known as the Sectional Dock Company, formed and organized as above stated, for the sum of $4,940. There are cross-appeals. One by the appellant from that part of the decree dismissing the libel as to the individual respondents; the other by the Sectional Dock Company, from the decree against it for the above mentioned sum.

Given Campbell and T. K. Skinker, for libellants.

D. T. Jewett, for respondents.

DILLON, Circuit Judge. The respondents make the question in this court that the case, as stated in the libel and made by the proofs, is not one of admiralty or maritime cognizance, and this, whether the libel be regarded as one for salvage or to recover as upon a maritime contract. The libel and monition show that the pleader intended a case for salvage compensation; but the facts are stated, and if the case is not one for salvage compensation, but is one upon a maritime contract to recover for maritime services, the liberal practice of the court of admiralty would probably allow it to be viewed in the latter aspect—more particularly as the objection was not taken until the hearing, if indeed at any time before the case reached the appellate court. The proctors in the cause have referred me to the decisions bearing up-

on the jurisdiction of the admiralty in cases supposed to be more or less analogous to this one, but it is conceded that none of them are exactly in point; and some of them are conflicting. The law of salvage grows out of navigation, and is intended to promote the interests of those engaged in navigating vessels which are the instruments of commerce and trade, and of those whose property is exposed to the perils of the sea, by awarding liberal compensation to the persons by whose assistance such property is rescued from impending peril or saved after actual loss. Abb. Shipp. 554. And because such services are connected with navigation and commerce or trade, the court of admiralty has jurisdiction to fix the amount of compensation and to enforce a maritime lien therefor; and such jurisdiction and lien are necessary because the owners of the property saved may be unknown or distant or irresponsible. No such reason or necessity exists in respect to fixed structures, such as these docks. In denying salvage compensation for taking up and securing rafts afloat in public navigable waters, Chief Justice Taney uses language which applies here. He says rafts "are not vehicles intended for the navigation of the sea, or the arms of the sea; they are not recognized as instruments of commerce or navigation by any act of congress; they are piles of lumber and nothing more, fastened together and placed upon the water until suitable vehicles are ready to receive and to support them to their destined port. And any assistance rendered to these rafts, even when in danger of being broken up or swept down the river, is not a salvage service, in the sense in which that word is used in the courts of admiralty." Tome v. Four Cribs of Lumber [Case No. 14,083].

Assuming that the allegations of the libel are broad enough to justify the court in treating the libel as one to enforce a contract, or to recover compensation upon general principles for the services rendered in raising the docks, I am of opinion that the contract or services do not relate to the navigation, business or commerce of the sea or public navigable waters, in such a sense as to make the contract or services maritime. The admiralty jurisdiction and the peculiar liens, rights and remedies which the admiralty recognizes and enforces, spring out of the movable character of the vessels and vehicles which are the instruments of navigation, commerce and trade. None of the reasons upon which this jurisdiction is founded, and these rights and remedies are given, apply to the stationary docks here in question; and my best judgment is that the controversy between these parties belongs to the courts of common law, and not to the court of admiralty.

The decree below against the dock company is reversed, and the libel dismissed as to all the respondents; but as the question of jurisdiction was not raised until after the proofs were taken, each party must bear the costs he has incurred, except that the costs in this court must be paid by the libellants. Decree accordingly.

NOTE. By the general admiralty law, maritime contracts include maritime services in building, repairing, supplying and navigating ships, and the admiralty jurisdiction in the United States extends to all maritime contracts, i. e., contracts which relate to the navigation, business or commerce of the sea. De Lovio v. Boit [Case No. 3,776]. The settled doctrine in this country is, that the admiralty jurisdiction extends to all maritime contracts, and "whether a contract be maritime or not depends not on the place where the contract was made, but on the subject-matter of the contract; * * * the true criterion is the nature and subject-matter of the contract, as to whether it is a maritime contract, having reference to maritime service or maritime transactions." Insurance Co. v. Dunham, 11 Wall. [78 U. S.] 26, 29. A Contract for building a vessel was held to be not a maritime contract, because made on land and to be performed on land. Ferry Co. v. Beers, 20 How. [61 U. S.] 393, 401. But this decision is not to be extended by implication. Insurance Co. v. Dunham, 11 Wall. [78 U. S.] 28. Locality of the place where made, as a test of the maritime nature of contracts, is rejected in this country. A ferry boat on the Ohio river may be the subject of a salvage service. The Cheeseman v. Two Ferry Boats [Case No. 2,-633]. The learned Judge Leavitt in that case expressed the opinion that salvage service could not be restricted to a service rendered to a vessel or the cargo of a vessel, but extended to all cases where valuable property is adrift or afloat, and is rescued from peril on any water over which the admiralty jurisdiction extends. Id. This view he considered to find support in the decisions in which steamboats have been libelled in admiralty for injuries to flat-boats and their cargoes, of which Fritz v. Bull, 12 How. [53 U. S.] 466, Culbertson v. Shaw, 18 How. [59 U. S.] 585, and Nelson v. Leland, 22 How. [63 U. S.] 48, are mentioned as examples. And he adds: "If, in collision cases, jurisdiction in admiralty can be maintained, when the injury is not to a vessel or the cargo of a vessel (not required to be enrolled or licensed), it results inevitably that it may be maintained for a salvage service in saving property not within either of those categories." And he supports his conclusions by pointing out the inadequacy of the drift laws of the states. Judge Nelson was inclined to regard a canal boat as not being a boat or vessel, though upon navigable waters, in such a sense as to subject it to a maritime lien for breach of a contract of affreightment. The Ann Arbor [Case No. 408]. 1858. See similar view, Buckley v. Brown, 3 Wall. [70 U. S.] 199, 1856, per Grier, J.; Jones v. Coal Barges [Case No. 7,458]. But a lighter was held to be subject to the admiralty jurisdiction. The General Cass [Case No. 5,-307]. So ferry boat. The Cheeseman v. Two Ferry Boats [supra].

The claim of the owner of a ship-yard in hauling up a vessel on his ways, and for the use of the ways, is a claim of a maritime nature, enforceable in admiralty. Wortman v. Griffith [Case No. 18,057], 1856, Nelson J. But see previous case of Ransom v. Mayo [Id. 11,-571]. 1853, where the admiralty was held not to have jurisdiction of a claim by the owner of the vessel against the owner of the ways, for the negligence of the latter in hauling the vessel up on the ways. A dismantled steamboat fitted up for a saloon, not subject of admiralty jurisdiction. The Hendrick Hudson [Id. 6,355]. Barge adrift is subject of salvage service. Seven Coal Barges [Id. 12,677]. So of a box of bullion. Williams v. Box of Bullion [Id. 17,-717]. A maritime lien can not exist upon a

bridge; and the opinion was expressed in a libel in rem against a bridge for a maritime tort, that a lien "could only exist upon movable things engaged in navigation, or upon things which are the subject of commerce on the high seas or navigable waters," such as vessels, steamers and rafts, and upon goods and merchandise carried by them, but not upon anything fixed and immovable, like a wharf, a bridge, or real estate of any kind. The Rock Island Bridge, 6 Wall. [73 U. S.] 213. But a vessel injured by any obstruction in navigable waters may sue in personam in the admiralty,—locality giving the jurisdiction in cases of maritime torts. Atlee v. Northwestern Union Packet Co., 21 Wall. [88 U. S.] 389. In Tome v. Four Cribs of Lumber [supra] it was held by Ch. J. Taney that taking up and securing rafts afloat in public navigable waters was not a salvage service, but rather in the nature of a mere finding, citing Nicholson v. Chapman, 2 H. Bl. 254, relating to a quantity of lumber, and in which salvage was denied, and The Upnor (a flat boat) 2 Hagg. Adm. 3. One ground of the decision of Ch. J. Taney was, that rafts "are not vehicles intended for the navigation of the sea, or the arms of the sea; they are not recognized as instruments of commerce or navigation by any act of congress; they are piles of lumber, and nothing more, fastened together and placed upon the water until suitable vehicles are ready to receive and transport it to its destined port. And any assistance rendered to these rafts, even when in danger of being broken up or swept down the river, is not a salvage service, in the sense in which that word is used in the courts of admiralty." As to rafts, see A Raft of Spars [Case No. 11,529]; 2 W. Rob. Adm. 251.

The jurisdiction of the district court over a case of salvage service on the Mississippi river is not questioned by counsel, and does not admit of question. Seven Coal Barges [supra], citing The Genesee Chief, 12 How. [53 U. S.] 443; The Hine v. Trevor, 4 Wall. [71 U. S.] 555; The Tug Eagle, 8 Wall. [75 U. S.] 15. Coal barges adrift on the Ohio may be the subject of salvage service. Seven Coal Barges [supra], Drummond, J. (Davis J., concurring). "The object of the law of salvage is to promote commerce and trade, and the general interests of the country, by preventing the destruction of property, and to accomplish this by appealing to the personal interest of the individual as a motive of action, with the assurance that he will not depend upon the owner of the property he saves for the measure of his compensation, but to a court of admiralty, governed by principles of equity." Per Drummond, J., Seven Coal Barges [supra].